Mr. Smith. Good morning, Your Honor. Judge King, Judge Agee, Judge Norton, it's a pleasure to be here, and on behalf of my client, Julius Henson, I thank you all for inviting me down here today, and certainly this case presents a quote from one of our middleweight boxers who now reposes in a cemetery in Baltimore. His name was Joe Gans, Judge Norton. And what he said was, is that when you tie a man's hands behind his back and you hit him, it's really not a fight, it's a massacre. And that's precisely what happened in this case as it related to Judge Blake's decision to grant a Rule 56C against Mr. Henson in Universal Elections. Mr. Henson, as the Court is aware from studying the facts, was waiting to go to a state court proceeding in which he was charged in a criminal information with four counts of election fraud. This is while the federal case was pending under the CPA, and Judge... By the federal case, you mean this case? Yes, Your Honor, this case. Being counsel in both cases, you have to pardon me for being somewhat familiar, because counsel had to make certain adjustments and certain strategies based on balancing the two cases to determine what rights had to be protected in each. So he had a criminal case in the state court, and he had a civil case in the federal court? Yes, Your Honor, he was, where he faced a significant time of incarceration in the state case from the same sovereign, the state of Maryland. Although they were different units in the state of Maryland, they were the same sovereign. That is, the Attorney General's office and the state prosecutor, which under the Maryland scheme is not a part of the Attorney General's office. But obviously, as a law enforcement agency, they both had concurrent information available to them. In point of fact, if you... Where was he being prosecuted? What county? He was prosecuted in Baltimore City, Your Honor. Baltimore City? He was. Circuit Court of Baltimore City? He was being prosecuted in the Circuit Court of Baltimore City. He had prayed a jury trial... And that's operated by the prosecuting attorney of the Circuit Court of Baltimore City? No, Your Honor, the state prosecutor under the Maryland... Yes, under the Maryland scheme, the state prosecutor has jurisdiction over all election violations. Statewide? Statewide, with the permission of the state's attorney in each one of our 24 jurisdictions. If the state... The state prosecutor is different than the Attorney General? He is, Your Honor. He's entirely different under the legislative scheme. What he does is that he roots out political corruption, election law violations, and there's one other aspect of his charge that he roots out. And your adversary here is the Attorney General of Maryland? Counsel? My adversary here is the great state of Maryland and the Attorney General who, under the scheme of the TCPA, is allowed to bring the action on behalf of the citizens of Maryland, primarily because it's interstate commerce that deals with these automated calls known as robocalls. The problem that counsel was faced with here is that the pending trial, which concluded in May of 2012, Mr. Henson, who was the only officer of the corporation, was brought before the district court and Judge Blake, the possibility of incriminating himself under the Fifth Amendment when he was asked to come to a deposition, both on his own behalf and on behalf of the corporation. It happens all the time in civil cases where there's some other criminal proceeding, whether it's a parallel proceeding or not. That in and of itself doesn't raise the type of constitutional question. It raises the Fifth Amendment question if that individual is pending court and there is an incarcerable penalty that he can face. You're entitled to assert the Fifth Amendment. I am. Which is what your client did, right? That is exactly what he did. He asserted the Fifth Amendment and the case went on. And the case went on. But your complaint is, unless I'm wrong, is that you think that this case should have been stayed because the criminal case was ongoing. Yes, the record reveals that not only did I advise the district court judge in advance of the stay that there was the possibility of an indictment or criminal information, but I formalized it in a motion to stay to say that, gee, there is no harm, no foul, if this case is kicked down the road until after the criminal case is litigated. That decision of Judge Blake to deny you the stay is a decision that we review on appeal for abuse of her discretion. It is, in my view. And that's what I raised in my brief, that it was, in fact, an abuse of discretion. There was absolutely nothing, nothing at all, which would have allowed, which would not have allowed the court the opportunity to allow him more time to defend himself. What happened in this case was she exercised her discretion badly in that regard. What eventually happened is that she found because Mr. Henson did not say anything, even after recognizing his Fifth Amendment right, that it is presumed that what he did by not doing it was knowingly, voluntarily, the assumption was ruled against him by Judge Blake. And in her memorandum and opinion, she says that. She says because he did not come in to give any testimony to refute the knowing and voluntary part of the TCPA. And she also indicated that this court has never found. She said you can use the Fifth Amendment plea against him. Basically what she said is you take the Fifth. It's a civil case. Right. And the jury is entitled to draw from that what they want. Well, she was entitled to draw from it from what she wants because we never got to the jury. If you got to a jury in a civil case, you can talk about the other side taking the Fifth Amendment. Right. You can't do that in a criminal case. Right. But the jury trial was beyond or should have been beyond the time in which the state case was tried. And I must admit, being frank with the court, that he did go to trial in the state system. He was acquitted of four, I believe, four out of the five charges, but he was convicted of the conspiracy to engage in not putting an authority line on a piece of campaign material under 16303 of the Maryland election law. Of course, going back to Mr. Gans, God rest his soul, as of May 11th, you didn't have your hands behind your back because your client was found not guilty of four and guilty of one, and this decision didn't come out until May 29th, so you had 18 days in order to start fighting, and you didn't do it. Is that right? I didn't have 18 days to start fighting. Well, you were found not guilty on May 11th, and the opinion wasn't issued until May 29th, and so there's a period of time with which you could have or your client could have responded without any Fifth Amendment problem. Not true. Because he's already been found not guilty. The motions for summary judgment and the replies had already been into the court pursuant to the scheduling order. That's one of the problems associated with how this thing was fast-tracked through in order to knock him out without raising his hands. The problem was here that he had already made his decision to assert the Fifth Amendment. There had been depositions taken. He had already made his decision not to answer the interrogatories. There had been questions posed by counsel for the Attorney General's office, and he was laid bare by the timing that it took Judge Blake, who, by the way, did make reference to a Daily Record article on the very fact that he was, in fact, acquitted and took the stand. But that's sort of like a Monday morning quarterback. The horse was out of the barn and was already in the field by that time. It didn't make any difference under the circumstance. Well, I guess theoretically you could say, okay, he's found not guilty. We want to go and give an affidavit and refute all these things. I had my deposition, which I took the Fifth on, I would guess. Well, the thing is, and the odd thing about it, and I'll have to be very candid with the court here, is that there was an appeal even taken from that misdemeanor conviction, which is currently pending in the Court of Special Appeals of Maryland. That's the conspiracy conviction? That is the conspiracy not to place an authority line on a piece of campaign material. That's a misdemeanor in Maryland? That is a misdemeanor punishable by one year in prison and a $1,000 fine, as opposed to a million dollars, which he suffered in this case along with Universal. There's a large difference. And even at that, there was a sentence because of the problems associated with the general proposition of robocalls, which obviously we attacked in this brief as it related to the constitutionality of the TCPA. And I didn't want to get too far away from that, but what was important, it seemed to me, and it seems to me to be in violation of due process, is the abuse of discretion that Judge Blake took, because she, in effect, determined that this was a palatable attempt to block the African-American vote in Baltimore City and PG County by sending these 110,000 calls. And by the way, he was acquitted of that, which he knew at the time that this opinion came out. So there was, in fact, in our view, and we have to pose it to you, Your Honor, Judge King, Judge Agee, and Judge Norton, is that there was a bias which existed on behalf of Judge Blake from the beginning. Conclusions which were made which were ultimately found not to be sustained by a jury. This is going to be substantially different between the criminal case and the civil case. You have a much lower standard in the civil case. Preponderance of the evidence, exactly right. There's no doubt about it, but if you can't raise your defenses because you're facing incarceration or time in jail, what are you to do? What you have to do is you have to figure, as counsel did, your strategy and how it's going to interpose. This was a case that was widely felt in Maryland. The tentacles of which had to do with who would control the reins of power in the state in terms of a gubernatorial election in 2010 for four years. And therefore, it went not only into Maryland, but it went across the nation as to how you deal with these robocalls and the interference with the sanctity of the home through a robocall. And I'm at the juncture where I'm going to sum up, Your Honor. We have placed in our brief, at least, and we haven't argued the TCPA. I've mentioned it. It has, and we're still fostering it, of course, in all of our points in our Rule 12B motion. But we believe that this was content-based speech that was at stake here. You're saying politics, First Amendment? I am saying that. You're not giving that up. Oh, I'm not giving that up for a moment. You spend most of your time talking about this today, the Fifth Amendment. That doesn't mean you won't give anything up. Oh, I think if you decide against me, it might be the first case of its kind, and I may get to ride over to Washington, which I look forward to doing, since you helped me in that regard about two years ago when I rode over there. So I'm looking forward to going back. They have good meals over there. Well, they have pretty good meals in the dining hall, so that's what I'm really looking forward to, even though my wife cooks a good meal. And in essence, Your Honor, I'm not giving it up at all. I'm strongly putting it before the Court because I do believe that our theory, as it relates to content-based speech, is something that most courts in the circuits have not caught up with yet as a result of the complicated nature of the body politic and how people make decisions in terms of the counterintuitive psychological aspect of this case. Why do you say it's content-based? Because, Your Honor, the message itself forces a person to act counterintuitively. The message, which you have in the briefs, that people can make a decision based on hearing that message. They can make a decision to come out to vote because they believe their candidate is being killed, that is, being murdered at the polls, and they can say to themselves, gee, if I had known I was going to be killed like that, I would have come out and voted earlier. Or they can say to themselves, well, I'll just stay home and vote. What makes it counterintuitive, based on all the literature, all of the psychiatric literature, the psychological literature, the social literature, the business literature that we're bombarded with every day as Americans, is that they all send messages to us to buy their product, to do what they want us to do, and we have to make decisions based on either our rational mind or we have to make decisions based on our subliminal mind and what we believe is the adequate thing to do. It was a subliminal message that was counterintuitive. That is, you can relax. Don't have to worry about it. They've taken it back, President Obama and Governor O'Malley. And so we believe that that is a message that's content-based if you take off the authority line. Because what it says to the person who listens to it, and by the way, in this particular case, we don't know as a result of this pleading whether anybody really ever got the call. There's no affidavit in the record that I've been able to see from any citizen to indicate of the 110,000 calls that they received them. And I'm going to reserve the rest of my time, whatever it may be, for a rebuttal to rebut my honorable adversaries. Thank you very much. Thank you, Mr. Smith. Mr. Groove? May it please the Court. There's no dispute that the message that's involved here failed to comply with the Telephone Consumer Protection Act because it failed at its inception to identify who was calling and failed to include an address or telephone number. And based on the undisputed facts in this case, Judge Blake properly granted the State of Maryland's unopposed motion for summary judgment. Well, Mr. Smith says it was content-based, which I assume it was content-based subject to the analysis to strict scrutiny. I assume you would disagree with that. Absolutely. The statute is not content-based. All messages are content-based. His argument essentially is the message is content-based, and because the message is content-based, therefore it violates the First Amendment. The statute itself makes it, quote, make any telephone call. It doesn't depend upon the content of the message. It doesn't depend upon who's making the message. And, in fact, Congress, when it was passing the Telephone Consumer Protection Act, specifically found that prerecorded automated messages were a nuisance and an invasion of privacy regardless of the content and regardless of who's initiating them. And because of that, the technical and procedural requirements of the Telephone Consumer Protection Act do not depend upon what you're saying or who's saying it. Regardless of who's saying it or what you're saying, you have to identify yourself at the inception of the call, and then you have to include an address or telephone number. None of that is content-based. I mean, there's absolutely nothing in the statute that's content-based, and Congress was very clear that they didn't want a content-based regulation with respect to the technical and procedural requirements. I mean, there are other sections of the Telephone Consumer Protection Act that do relate to content. They relate to telemarketing sales. But the technical and procedural requirements, which are at issue here, have absolutely nothing to do with the content of the message or who happens to be initiating it. They've raised, because they can't dispute the basic facts, they've raised- What kind of analysis do we use then? For the First Amendment? Yes. The First Amendment is an intermediate analysis. Intermediate. Yes, under rock versus- Intermediate scrutiny. Yes, Your Honor. Yes, under word versus rock against racism. Then you say Judge Blake got it right. Absolutely, yes. The Supreme Court was clear in Ward that whether it's content-based or not is dependent upon were they trying to prohibit the content of the message. Here, there is no attempt to regulate the content of the message. And because of that, Ward says that you apply an intermediate level of scrutiny and that it passes constitutional muster if it's narrowly tailored and furthers substantial government interest. And I know that the United States will also be addressing this issue, but here it does both of those things. That's what they're in here for, to protect the statute, I suppose. Yes, Your Honor. Specifically with respect to the First Amendment challenge to the statute. How come you all just wouldn't give them a continuance of the civil case until they finished that criminal case? They asked for a blanket, indefinite stay of all proceedings. But what they could really have been entitled to was get the criminal case behind them. Well, I think Mr. Smith conceded that they would still be asking for the stay today because of the misdemeanor conviction. Well, but that's not behind them, I guess maybe. Even though they were acquitted on four counts, they were convicted on one. I guess if the Court of Appeals thinks there's some defect in it, they could send it back for another trial. I mean, lots of times you hold up the civil proceedings to let the criminal proceedings go. Well, in Cordell, the United States Supreme Court said that... Well, they don't have to, but most of the time they do, particularly when the same parties are involved. I mean, the United States, sometimes they've got civil proceedings and criminal proceedings going against the same people that arise on the side of the same facts. They'll put the civil stuff off and let the criminal proceedings go along. Because you run into discovery problems with people taking the Fifth Amendment. Lawyers have to make tough decisions and the parties have to make tough decisions. Do you give up your Fifth Amendment right by testifying in a deposition or testifying in a civil trial when you've got a criminal proceeding against you? But you say, well, that's abused. That's reviewed for abuse of discretion, and it is. But lots of times the parties agree to it. The judge doesn't even have to deal with it. They just hold off on the civil side. Your Honor, when this was filed, there was no criminal proceeding. We filed the civil suit prior to the indictment of Julius Henson, and we had an interest in stopping Mr. Henson from doing this in the future, and we think that it is in the public interest to stop this. You asked for an injunction and damages? We did, Your Honor. The order only contains damages, but we did ask. You could have said, we don't want the damages yet. We'll hold off on that. We'll be satisfied with an injunction to keep him from doing this stuff until he gets his criminal case over with. The defendant certainly never offered to be subject to an injunction. In fact, the only thing the defendant's ever said, if you look at the defendant's motion for stay. Was he still in the election business? Yes. That's what he does for a living. But does another election come up? Do they have elections every year up there or every two years or every four years? The last election, the one that occurred last year, was the last election. The 2012 election? Yes, Your Honor. The election that's at issue in this case. Was 2010? Correct. Does he just do gubernatorial elections? He works in all of them. I think he'll handle anybody who will pay for him. In fact, the candidate he was working for here, he had once been quoted in the paper as saying he was a Nazi. And then he was working for him in this campaign. So I think if you have money, he's willing to. Well, that's the way a lot of political consultants work probably. Yes, but I was just responding. Lawyers do. I mean, lawyers do. Not on our side, Your Honor. I mean, that's right. It all depends on which side you're on, which side you need to be on. What would you say is the most specific rationale as to why Judge Blake did not abuse her discretion in permitting the civil case to go forward? The defendant is required to show special circumstances. Under Cordell, the Supreme Court said that in order to argue for a stay, you have to show special circumstances why the action should be stayed. Here, the only thing he said, it was a two-page motion to stay, and the only thing he said in substance was, there's a criminal investigation going on here. There was no end. He wanted it to apply to all defendants and wanted it to apply forever. And what Judge Blake did was say, no, I'm denying your motion. She did say that we'll address Fifth Amendment issues as they come up in discovery. And, in fact, Mr. Henson never testified individually in a deposition. We kept trying to get him there, but we never got him there. Now, he did testify as a designee of the corporation. He didn't make Fifth Amendment a deposition? He did as a designee of the corporation, but that was their choice. But if he testifies as a designee of the corporation, you'd use that against him? Absolutely. Well, sure, so he can take Fifth Amendment. Yes, but the corporation could have designated someone else. He was the only officer, but they did have an employee, Rhonda Russell, who was also a defendant, who had immunity and who, in fact, testified. And you all were investigating him at the same time? Well, we had— You conduct a criminal investigation and then call the guy for a deposition, and he takes the Fifth Amendment and you use the Fifth Amendment against him and use the fact that he took the Fifth Amendment against him in the civil case. Well, Baxter— I mean, that's just—when it's all the state of Maryland, it looks like a dirty pool. Well, they are, as Mr. Smith indicated, they're two different—we're the Attorney General's office. They're two different offices. Yes. But if you look at the pleadings, it says—on both of them, it says state of Maryland. Right? That's correct, Your Honor. It's two different lawyers. But the party that you're representing and the party that the prosecutor was representing— is the state of Maryland. That's correct. You represent the state, and he's representing the state, and the state is investigating him criminally and prosecuting him criminally, and you're suing him under this Telephone Act and taking his deposition, and he has to take the Fifth because the state of Maryland is also prosecuting him. Yes, Your Honor. And any lawyer, as he solves, is probably going to tell him, you better take the Fifth Amendment because going to jail could be worse than getting damages against you or getting an injunction against you. That's certainly the case. So it really puts you in a rock and a hard place. The charges here, though, were different. The state claim was under a different statute, has different relief. The federal claim is just the Telephone Consumer Protection Act, and the conduct we were trying to stop. The state prosecutor wasn't trying to change future— well, I guess he would say he was trying to change future behavior. He was trying to punish. He was trying to put him in jail. And he was trying to get a deterrent against everybody else. If he puts this fellow in jail for X number of years, that's going to scare somebody else off next election, and nobody's going to want to engage in this stuff, which is a laudable goal, maybe, if it's all about violation of the criminal law. He ought to be prosecuted. Certainly think so. But to carry on a civil proceeding at the same time, that's what I'm getting at. Which is what we have here. It's a civil— The criminal proceeding is the collateral proceeding here. You've got this civil proceeding where he took the Fifth Amendment because he was being prosecuted. It's a civil proceeding— He said he also took the Fifth Amendment in the interrogatories. Is that true? I believe that is correct, Your Honor. Okay. So you served interrogatories on him. Yes. And the interrogatories had to be filed, responded to under oath. And so, you know, if you're going to say something under oath, you either got to tell the truth or subject yourself to perjury or take the Fifth Amendment. That's the three choices you have. And he took the Fifth, I guess, because he was being prosecuted. Yes, Your Honor. And then you use that against him because the jury can infer that if they take the Fifth Amendment, you must have done something wrong. Although the evidence is overwhelming. All the evidence. And the fact that the defendant didn't respond— Was there a hearing on the motion to stay? No, Your Honor. How did it come to be denied? Was it just denied in a pretrial order? How was it disposed of? The judge issued an order and a memorandum of opinion. And as I mentioned, the motion only was two pages. It included no evidence. He asked the court for permission to do that, but he never submitted anything. Was there a hearing on the summary judgment motion? No, Your Honor. There also was no opposition. You can say there's no opposition because he wouldn't testify. There was plenty of other evidence that he could have used, although none of it was helpful to him. He could have submitted documents. He could have submitted affidavits from other people. He could have submitted deposition testimony from people who were deposed. Lots of people were deposed. It's just all of the evidence was harmful to him. The one gap is he didn't testify. But all of the testimony that exists, if you read Rhonda Russell's testimony, who was his employee and clearly is favorable to him, all of the evidence here is against him. Let me ask you this question. Other than the motion to stay as filed by the appellant and your opposition to it and the one paragraph order from the district court, was there anything else that came up in the civil proceedings about the stay? There was only one other time, and that was with respect. The only other time that the defendant raised it in the record was in connection with discovery against the corporation. And if you look at the judge's grant of our motion for sanctions, she specifically put in a caret and said that Rhonda Russell could respond, that the corporation could have Rhonda Russell provide the documents that we were requesting from the corporation. Was she an officer of the corporation? No, she was not. However, she was an employee, and she had access to the records that we wanted 30B6 authorizes that? Yes, it does, Your Honor. Does it authorize the court to designate who the 30B6 witness will be? I don't know that it does. I believe the corporation is responsible for designating who. Would you say the judge designated her? No. The judge said the corporation could fulfill its responsibilities through Rhonda Russell. She wasn't ordering how they fulfilled their responsibilities. She was just saying, hey, there's someone here who doesn't have any Fifth Amendment right, and the corporation has no Fifth Amendment right, and the corporation can provide the discovery that the state wants through her. I see that my time is up. If you have any questions about either their liability or the other issues, I'd be happy to answer them. Otherwise, I'd submit that the lower court properly granted the state's unopposed motion for summary judgment. Thank you, Your Honor. Thank you, sir. Ms. Powell? May it please the Court, I'm Lindsay Powell for the United States, and I'm here to respond to Appellant's First Amendment challenge to the provisions of the TCPA. And you're an intervener here? Yes, Your Honor. To protect the constitutionality of the statute? Yes, against the First Amendment challenge specifically. I know the panel has already had the opportunity to talk about this issue a little bit, but there are two points that I'd like to make. First, I want to reiterate that this provision clearly is content neutral. Its application does not turn on who is speaking or what is being said, but rather it applies to all calls that are made through this automated mechanism. And we do know from the Court's opinion in Turner Broadcasting, among many others, that regulations that apply only to one type of medium are not subject to strict scrutiny for that reason, that the legislatures are entirely permitted to take into account differences among different types of technologies, different media, in determining how they should be regulated. And the appropriateness of doing so is particularly evident here. As Congress itself noted in making findings and enacting the TCPA, and as courts have often remarked, the Eighth Circuit in Van Bergen and the Ninth Circuit in Bland v. Fessler are particularly notable. Automated calls are unusually invasive and present a number of risks that other types of communications, including live calls, do not present. And it's important to keep those features of the call in mind when undertaking the required intermediate scrutiny analysis, which is to say when looking to see whether the provisions are narrowly tailored to serve the government's important interests. Briefly, we have identified three important interests. There's no dispute as to their importance. These are the protection of residential privacy, the prevention of the dissemination of misleading or deceptive information, and the facilitation of the enforcement of other provisions, including other provisions of the TCPA. We submit that these disclosure requirements are narrowly tailored to serve all three of these purposes. I'd be happy to discuss that more. I do want to draw the Court's attention to its earlier opinion in National Federation of the Blind, which considered a number of requirements under the Telemarketing Act, including a very similar disclosure requirement. And in upholding that provision under the rubric of intermediate scrutiny, the Court observed that the disclosure requirement was a very modest burden and it had no difficulty in finding it narrowly tailored to further several of the interests that are also implicated here. Although we reject appellant's contention that this is content-based or that it's relevant in any way that the speech here is arguably political, I would additionally note that the Supreme Court has upheld disclosure requirements as modest burdens even when they do apply specifically to political speech. In Buckley v. Valeo and more recently in Citizens United, the Court found similar disclosure requirements requiring the speaker to identify him or herself to be consistent with even exacting scrutiny. So contrary to appellant's suggestion, the challenge here is in no way the first of its kind. Courts have many times considered First Amendment challenges to disclosure requirements both in the context of phone calls and even in the political context. And there are many examples, which I've just run through, in which they have been upheld without any difficulty. So the extraordinary thing would be to find that there's any constitutional infirmity here rather than the opposite. If the Court has any questions, I'd be very happy to discuss them. You can't have us out on this Fifth Amendment. Unfortunately not, Your Honor. You can take the Fifth on that. Thank you very much. Thank you. We appreciate it. Mr. Smith? Thank you very much, Your Honor. Let me rise to the occasion of this Fifth Amendment analysis that was not made at all by Judge Blake as to special circumstances. I think my brother counsel indicated. Did you ask the judge to do that? She didn't, Your Honor. I'm asking you, did you ask her to make the special circumstances analysis? I did not. I did not presume to teach a learned judge the law. Well, I mean, other than filing the motion for stay, which doesn't say a whole lot, what else did you do? We had a telephone conference in which the State pressed Mr. Henson to take a deposition as well as to answer the interrogatories. And Judge Blake specifically advised them that he had a right to take the Fifth Amendment and that she would not force him. Now, that was a telephone conference with the court. With the court, with counsel, on the telephone. We believed that we had a safe harbor at that point and that the motion for summary judgment under 56C would not be granted because the judge confirmed what we believed to be the case, that he subjected himself to jeopardy by going in and giving this testimony. So that was the other thing that was done. Did you ever file a memorandum with the court that set out the specifics of why the judge should grant the motion for stay? Did you ask for a hearing so that you could present oral argument on why the stay should be entered? That's what I'm looking for. There's nothing in the record to indicate that, Judge Agee. Let's just be clear about that so we don't waste a whole lot of time kibitzing about it. There's nothing in the record. What's in the record is this. We made it abundantly clear that we were facing an incarcerable trial before a jury. How is Judge Henson's case different than every other case that has a Fifth Amendment as a parallel criminal and civil proceedings? I mean, they're all the same, right? And then they all, when there is a possibility that the state may use what is said against an individual under the Fifth Amendment, they're all the same in promoting due process. Yes. But you acknowledge that some cases they grant it and some cases they don't grant the stay. No, that's what Judge King said. I didn't say that. I'm asking you if you will acknowledge that there's some misguided court out there that grants the stay and there's some misguided court out there that doesn't grant the stay. I'm hoping that there's no misguided court that this honorable panel has jurisdiction over who will never do it again as a result of your opinion. And that's why I rode all the way down here from Baltimore in the traffic to ask you not to allow that to happen, at least in this circuit. I'm not going to change the standard of review, I don't think. I don't think you will. I'm not going to change it from abuse of discretion to something else. It's going to stay as a discretionary call. I think it needs to because I think that's what the law is and we all want to follow that. We all just want to be, we want to give due process and we want to have fairness fundamentally in our system of justice. And that's what didn't happen here. Just one thing about this Rhonda Russell business because I think I need to put a pin in this. The employee, this employee was granted immunity by the state. She was only authorized to get from the website, the universal election and politics today website, those things which were a matter of public record. And that was it. That was when counsel referred to the carrot in the judge's opinion, she wasn't allowed to come in as an officer of the corporation and talk about. You're saying she couldn't have been the 30B6 witness. No, she couldn't have been the 30B6. She couldn't have been the 30B6 witness. It would have been impossible. She got immunity and then testified against your guy. Yeah, yeah, that's the way it happened. But what she did in her deposition, which you have in the record, she validated the issue as it relates to our point about the content-based nature of this particular call. And because the government didn't like it, and it's fairly obvious that they didn't like it because they came after him with everything but a book of God. They jumped on him pretty hard, both in the civil and the criminal basis. They went into his house. They did a whole lot of things that they didn't do to members of the political campaign committee who actually tried to pay for the call but never paid for it. So Mr. Henson became the poster boy for the lack of due process. He became the poster boy for the intolerance in thinking what political campaign people do who are consultants and who merely give advice. He was a guy who was an independent contractor who gave advice, and because he gave advice and somebody had to dance to the tune, he was the guy who received the brunt of this situation. Thank you very much, Your Honor. I note that my time has ended, and I do appreciate it. Thank you, Mr. Smith. We appreciate it. We'll come down in Greek Council and take a quick break.
judges: Robert B. King, G. Steven Agee, David C. Norton